# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**WILLIAM J. LORUM,**

                                    **Plaintiff,**

-vs-                                                    **Case No.  6:04-cv-1554-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,**

                                    **Defendant.**
_____

# ORDER

        This cause came on for consideration without oral argument on the Complaint filed by

William J. Lorum, seeking review of the final decision of the Commissioner of Social Security

denying his claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration.  Doc. Nos. 4-5.  This matter has been referred to me for disposition

pursuant to 28 U.S.C. § 636(c).

## I.        PROCEDURAL HISTORY.

        On October 3, 2001, Lorum filed an application for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401, *et seq*., alleging a disability onset date of March 6, 1997.[1]  TR. 74-76.

Lorum's claim was denied, initially and upon reconsideration.

_____

        [1] This date was later amended to March 31, 1999.  TR. 15, 575.

Lorum requested a hearing before an administrative law judge (ALJ), which was held on September 9, 2003.  Lorum, who was represented by an attorney, testified at the hearing.  TR. 573-604.

The ALJ determined that Lorum was insured for disability benefits through December 31, 2000.  TR. 16.  After considering the testimony and the medical evidence presented, the ALJ found that Lorum had not engaged in substantial gainful activity since the alleged onset date of his disability.  TR. 16-17.  The ALJ concluded that the medical evidence indicated that Lorum suffered from osteoarthritis.  TR. 18.  The ALJ determined that Lorum's impairment was severe but that it did not meet or equal any of the impairments listed in the applicable social security regulations.  *Id.*[2]

The ALJ found that Lorum had the residual functional capacity (RFC) "to perform the exertional demands of sedentary work, or work which is generally performed while sitting and never requires lifting in excess of ten pounds . . . ."  TR. 20.[3]  In reaching this determination, the ALJ declined to accord significant weight to a disability finding dated August 2001 from the Department of Veterans Affairs (VA) indicating that Lorum had a combined service-connected

---

[2] The ALJ found that Lorum's alleged mental impairment was not severe.  TR. 20.

[3] Sedentary work is defined by the regulations as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  The regulations further provide that "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  *Id.*

disability rating of 70%, effective March 31, 1999.[4]  TR. 19.  The ALJ concluded that the VA

determination was based on an evaluation that took place after Lorum's date last insured.  *Id.*

The ALJ found that Lorum's "statements concerning his impairments and their impact on

his ability to work . . . [were] not entirely credible in light of [his] own description of his activities

and life style, the degree of medical treatment required, the reports of the treating and examining

practitioners, and the findings made on examination."  TR. 19.

The ALJ determined that Lorum was unable to return to his past relevant work.  TR. 20-21.

The ALJ further found that Lorum "had the [RFC] to perform the full range of sedentary work" on

or prior to his date last insured.  TR. 22.  The ALJ relied exclusively on the Medical-Vocational

Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2 (the "grids"), to determine that jobs existed in

significant numbers in the national economy that Lorum was able to perform.  TR. 21-23.

Therefore, he concluded that Lorum was not disabled.  TR. 23.

Lorum requested review of the ALJ's decision by the Appeals Council.  TR. 10.  On

August 18, 2004, the Appeals Council denied Lorum's request for review.  TR. 6-9.  This appeal

timely followed.  Doc. No. 1.

## II.    JURISDICTION.

The ALJ's decision become the final decision of the SSA once the Appeals Council denied

Lorum's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R.

§ 404.981.  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

---

[4] The VA paid Lorum disability payments at a rate of 100% because he was unable to
secure employment as a result of his service-connected disability.  TR. 273.

### III.    STATEMENT OF FACTS.

A.    *Lorum's Testimony.*

Lorum was born on September 2, 1951.  TR. 580.  He completed the eleventh grade and obtained a GED.  TR. 576.  Lorum is 5'8 ½" tall, and he weighed 235 pounds at the time of his hearing.  TR. 587.  Lorum testified that he had gained approximately fifty-five pounds since March 1999.  TR. 587-88.

Lorum previously worked as a telephone technician/cable operator, merchant marine, furniture delivery person, and bus driver.  TR. 109, 119, 127, 582-83.  Lorum served in the United States Marine Corps (USMC) from August 1970 to June 1973.  TR. 74.  Lorum's most recent relevant employment was as a bus driver for the New York City Transit Authority.  TR. 583.

Lorum reported that he suffered from several ailments.   He had problems with his neck due to a cracked vertebrae.  Any movement of his head caused pain to shoot through his neck and his shoulders.  R.  585.  He also had numbness in his arms and hands as a result of the cracked vertebrae.  TR. 586.  He also had arthritis in his fingers.  These impairments made it difficult for him to hold on to anything. TR. 586.

Lorum also had problems with his ankles, legs and hips.  TR. 585-86, 588.  Lorum brought crutches to his hearing, and he wore braces on both of his knees.  TR. 591.  Lorum reported that he began using a brace for his left knee approximately four to five years before the hearing.  He began using crutches approximately two years earlier.  Lorum stated that he also had a cane and a wheelchair.  TR. 592.

He also had chest pains, and he had had breathing problems since 1999.  TR. 586, 588, 598.  Additionally, he was very depressed and had mood swings.  TR. 589.  His memory was "terrible."  TR. 596-97.  Lorum reported that he was unable to sleep and the medications he was taking were not helping much.  TR. 586.  Lorum stated that he slept for about five hours during a typical night.  TR. 596.

Lorum testified that before December 31, 2000, his worst problems were "[p]ain and swelling of the legs, walking, bending, [and] lifting."  TR. 597; *see also* TR. 133-39.[5]  He estimated that the furthest he could walk in 2000 was about "half a block, quarter of a block."  TR. 600.  Lorum stated that he could not perform sedentary work in 2000.  Lorum testified that his symptoms began to deteriorate significantly in 1996 and 1997.  TR. 590, 598.

At the time of the hearing, Lorum was unable to sit for longer than fifteen minutes without needing to get up an move around because his knees would lock.  TR. 593-94.  He apparently could stand very little, not more than five minutes.  TR. 594.  He could not walk more than one and half blocks.  TR. 586.  He could not lift anything.  He was also unable to bend.  TR. 594.

His wife and children handled the household chores.  TR. 595.  During the day, he would watch television and sleep.  TR. 596.  Lorum had a driver's license.  He testified that he rarely

---

[5] On a March 6, 1999, disability report, Lorum wrote that he was a cub scout master and camp counselor.  TR. 137.  While this report is unclear as to when Lorum performed these activities, a Case Development Sheet dated March 22, 1999, reflects that Lorum helped with his son's Boy Scout troop, took care of his personal hygiene, did a few household chores, walked once a week for exercise, and drove a vehicle.  TR. 141.  The source of this information is not provided.  *Id.*

-5-

drove, but he did drive himself to the hearing, which was a ten-minute trip.  TR. 594.  He tried to

attend church every other weekend.  TR. 595.

      B.    *Medical Evidence.*[6]

Lorum was treated at certain VA hospitals for various ailments on several occasions from

February 1997 to February 2002.  TR. 305-454.  Beginning in the earliest of these records, Lorum

complained of severe left ankle, knee, hip, back, and leg pain.  *See, e.g.,* TR. 419-20, 422.[7]

An x-ray taken on February 25, 1997, showed that Lorum had moderate hypertrophic

change and degenerative change in his left knee.  TR. 449.  An x-ray taken March 17, 1997,

reflects that Lorum had mild narrowing of the joint spacing in his left hip.  TR. 448.

On December 27, 1997, Lorum sought treatment at Memorial Health Systems for severe

left hip, knee, and ankle pain.  TR. 190-97.  Lorum complained that he was unable to walk, sit or

lie down without discomfort.  TR. 195.  Although the treatment records are difficult to decipher, it

appears that Lorum was diagnosed with, among other things, arthritis.  TR. 190.

An x-ray taken December 29, 1997, revealed severe osteoarthritis of the left knee.  TR.

448.  Lorum was prescribed Percocet.  TR. 415.

On January 23, 1998, Gregory M. Lower, D.O., examined Lorum for purposes of preparing

a compensation and pension evaluation.  TR. 198-200.  Lorum reported that he injured his left

---

[6] Lorum does not contest the ALJ's determination that his alleged mental impairment was not severe.  Thus, I will only review the medical evidence as it relates to Lorum's physical condition.

[7] A notation dated April 28, 1997, reflects that Lorum failed to attend a scheduled appointment.  TR. 418.

knee in 1972 while serving in the USMC and that he underwent a ligament reconstruction and medial meniscectomy[8] following this injury.  TR. 198.  Lorum complained that he was experiencing swelling, popping, clicking, severe pain, and "giving away of [his] left knee."  *Id*.  Lorum reported that he was unable to walk more than two hundred feet.  He also complained of pain in his left hip as well as swelling and decreased range of motion (ROM) in his left ankle.

Upon examination, Dr. Lower observed moderate crepitus[9] in Lorum's left knee and pain to palpation over the medial joint line space.  Dr. Lower further observed that Lorum exhibited pain to palpation over the lateral aspect of his left hip and greater trochanteric region.  Lorum also demonstrated pain to palpation in his left ankle.  TR. 199.  Dr. Lower noted that Lorum had a significant antalgic gait.  TR. 200.  Dr. Lower further noted that x-rays revealed severe osteoarthritic degenerative changes of the left knee, and early osteoarthritis of the left hip.  TR. 199.

Dr. Lower's impression was:  (1) status post-medial meniscectomy with severe osteoarthritic degenerative changes of the left knee; (2) early osteoarthritis of both hips with associated trochanteric bursitis[10] of the left hip; and peroneal tendinitis[11] of the left ankle.  Dr.

---

[8] Surgical excision of a meniscus of the knee or temporomandibular joint.  *See* MEDLINEPLUS, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book =Medical&va=meniscectomy (last visited March 28, 2006).

[9] "Crackling; the quality of a fine bubbling sound . . . that resembles noise heard on rubbing hair between the fingers."  STEDMAN'S MEDICAL DICTIONARY 409 (26th ed. 1995) (STEDMAN'S).

[10] "Trochanteric bursitis is characterized by painful inflammation of the bursa located just superficial to the greater trochanter of the femur.  Patients typically complain of lateral hip pain, although the hip joint itself is not involved.  The pain may radiate down the lateral aspect of the thigh."  Patrick M Foye, *Trochanteric Bursitis*, EMEDICINE,

Lower opined that Lorum "would have a moderate amount of difficulty with standing for protracted periods of time, doing repetitive bending, stooping or lifting . . . ." TR. 200.

On April 3, 1998, T. Thiruchelvam, M.D., examined Lorum. TR. 201-04. Lorum reported increasing problems with his left knee and decreased ROM that caused problems with his walking. Lorum stated that he was having trouble sleeping due to pain. TR. 201. Dr. Thiruchelvam observed that Lorum had difficulty getting in and out of the examination table and that he protected his left knee. Lorum wore a knee brace to his examination. Dr. Thiruchelvam noted that "standing for a few minutes in the examination room cause[d] [Lorum] pain . . . ." TR. 202. A straight-leg raising test was positive for pain on Lorum's left side. TR. 206. Dr. Thiruchelvam observed that Lorum's gait was slow and that he walked very slowly favoring his left lower extremity. Lorum was unable to walk on his toes or heels or squat. Dr. Thiruchelvam opined that Lorum would "not be able to walk 30 feet without any assistance devices." TR. 203.

Treatment notes from the VA dated June 2, 1998, indicate that Lorum was treated for chronic left knee pain and instability. TR. 410. The attending physician observed that x-rays of Lorum's left knee revealed severe degenerative joint disease (DJD). The attending physician also noted that Lorum would eventually need total knee replacement surgery (TKR). *Id*.

---

http://www.emedicine.com/pmr/topic141.htm (last visited March 28, 2006).

[11] "Peroneal tendonitis is an inflammatory condition of the peroneal tendon, which runs along the outside of the lower leg, behind the ankle and under the foot." *See* ARTHRITIS PAIN CURE CENTER, http://www.arthritis-pain-cure.com/article_info.php/articles_id/297 (last visited March 28, 2006).

On September 10, 1998, Lorum presented to Dr. Lower with complaints of pain and swelling in his left knee.  TR. 511.  Dr. Lower observed that x-rays of Lorum's left knee revealed severe osteoarthritic degenerative changes with marked narrowing of the medial and lateral compartments, as well as the patellofemoral joint.  TR. 512.  Dr. Lower's impression was osteoarthritis of the left knee.  TR. 511-12.  Dr. Lower treated Lorum with bracing, anti-inflammatory agents, and pain medication. TR. 512.  In November 1998, Lorum reported that his brace was fitting well but gave only minimal relief from pain.  TR. 510.

On December 14, 1998, the attending physician permitted Lorum to take culinary art school classes where he needed to stand.  TR. 407.

Treatment notes dated January 1999, reflect that Lorum was not responding well to medications and the use of a knee brace.  Total knee replacement evaluation was recommended. TR. 398, 400.

On February 23, 1999, Lorum was examined by James R. Shoemaker, D.O.  TR. 218-21. Lorum presented with complaints of pain in his left hip, knee, and ankle, and shortness of breath. Lorum wore a knee brace to his examination.  Dr. Shoemaker noted that Lorum used a cane on occasion, but that he did not bring one to the examination.  He was able to walk thirty feet without the use of a cane. TR. 218.  He had normal ROM on his hips, knees, ankles and feet.  TR. 220. Dr. Shoemaker noted that x-rays revealed mild mid thoracic compression fractures throughout Lorum's thoracic spine, severe osteoarthritis in his left knee, and moderate osteoarthritis in his left hip.  TR. 220.  Dr. Shoemaker's impression was: (1) severe osteoarthritis of the left knee; (2)

moderate osteoarthritis of the left hip; (3) chronic obstructive pulmonary disease (COPD); (4)

thoracic compression fractures; and (5) probable osteoporosis.  TR. 221.

A spirometric pulmonary function test administered on February 23, 1999, was normal.

TR. 222-26.

William P. Friedenberg, Ph.D., evaluated Lorum on March 9, 1999.  At that time, Lorum

reported that he watched television and did a few household chores.  He played guitar and walked

on the beach once a week for exercise.  He drove for only short distances when he had to do so.

TR. 228.

On May 11, 1999, Lorum presented to Dr. Lower with complaints of pain over the lateral

aspect of his left foot.  TR. 506.  Dr. Lower's impression was peroneal tendonitis.  *Id.*

On September 20, 1999, Lorum complained that he was experiencing bilateral hand

numbness and occasional neck pain.  TR. 503.  Dr. Lower noted that x-rays revealed marked

narrowing of C4/5, C5/6 disc space with associated spur formation over the anterior inferior

bodies of C-4, C-5, and C-6.  Dr. Lower's impression was cervical degenerative disc disease with

mild upper extremity radiculopathy.[12]  *Id.*

On December 14, 1999, Lorum complained of intermittent symptoms for the left upper

extremity.  Upon examination, Dr. Lower noted restricted spinal range of motion and muscle

spasms.  His assessment was cervical degenerative disc disease without significant radiculopathy.

TR. 502.   He made the same findings in March 2000.  TR. 501.

---

[12] "Disorder of the spinal nerve roots."  STEDMAN'S at 1484.

X-rays of Lorum's left knee taken in April 2000, revealed severe DJD.  TR. 388.  On

August 21, 2000, Lorum weighed 257 pounds.  He was classified as morbidly obese.  TR. 378-79.

In June 2000, Lorum told Dr. Lower that his right knee was buckling. TR. 499.  An x-ray revealed

severe tricompartmental osteoarthritis of the right knee.  Dr. Lower's impression was cervical

degenerative disc disease and severe osteoarthritis of the right knee.  *Id*.

On August 23, 2000, Lorum reported that he was having difficulty sleeping due to

recurrent neck pain.  TR. 498.

On September 27, 2000, Lorum was seen by Dr. Lower for another compensation and

pension evaluation.  TR. 264-67.  Lorum presented to Dr. Lower with complaints of pain and

intermittent swelling in his left ankle, severe medial compartment pain, popping, clicking,

intermittent swelling and "giving way" in his left knee, and pain in his left hip with standing for

protracted periods of time or walking long distances.  Lorum exhibited a mild antalgic gait with

respect to his left lower extremity, predominantly in relationship to his left knee.  Dr. Lower

observed that Lorum had pain to palpation in his left ankle and hip, and moderate crepitus with

range of motion in his left knee.  TR. 265-66.  Dr. Lower also observed that Lorum was unable to

walk for longer than forty-two seconds at a pace of one mile per hour on a treadmill without

experiencing left knee pain.  TR. 267.

Dr. Lower noted that x-rays revealed severe osteoarthritis in Lorum's left knee and

moderate osteoarthritic degenerative changes of the left hip.  TR. 266.  Dr. Lower's impression

was: (1) chronic ankle sprain of the left ankle with associated peroneal tendonitis; (2) status post-

medial meniscectomy with severe tricompartmental osteoarthritic degenerative changes of the left

knee; (3) moderate osteoarthritic degenerative changes of the left hip with associated trochanteric bursitis.  Dr. Lower opined Lorum had a significant antalgic gait that would prevent him from standing for protracted periods of time, walking long distances, and doing repetitive squatting. TR. 267.  Dr. Lower also recommended that Lorum undergo a left total knee replacement.  *Id*.

On October 26, 2000, Dr. Lower observed that Lorum had restricted spinal mobility with rotation and paraspinal muscle spasms.  TR. 497.  Lorum's upper extremity motor function was normal and his grip strength was fifty-five pounds on the right and twenty-eight pounds on the left. Dr. Lower treated Lorum with anti-inflammatory agents and pain medication.  *Id*.

On November 6, 2000, Lorum reported that he was experiencing problems with his right knee.  He was diagnosed with DJD of the left knee.  The attending physician advised Lorum that he was too young for a total knee replacement at that time.  TR. 371; *see also* TR. 370.

On November 30, 2000, Dr. Lower assessed Lorum with severe tricompartmental osteoarthritis of the left knee with associated synovitis.  TR. 496.

In March 2001, James E. Poole, a prosthetics representative affiliated with the VA, observed that a controller knee orthosis (brace) Lorum wore to an appointment did not show any substantial wear for its age.  Poole also noted that there was no wear/tear or cuts on Lorum's jeans. TR. 365.

On May 1, 2001, Lorum presented to Dr. Lower with complaints of popping, clicking, and medial joint line pain and loss of ROM in his right knee.  TR. 269.  Lorum also complained of popping, clicking, swelling, and pain over the medial joint line space in his left knee.  Dr. Lower opined that Lorum also had severe osteoarthritis in both knees.  TR. 270.  Dr. Lower further

-12-

opined that Lorum's knee condition "would give him difficulty with standing for protracted periods of time or walking long distances." TR. 271.  He classified Lorum as "a limited community ambulator with a need of assistive device." *Id*.  Dr. Lower recommended that Lorum undergo a left total knee arthroplasty.[13]

On May 9, 2001, Lorum presented to the VA with complaints of extreme knee pain.  An x-ray revealed severe osteoarthritis in his left knee.  The assessment of the attending physician was osteoarthritis and hypertriglyceridemia.[14]  Lorum was told that he was too young for a knee replacement. TR. 364.

On June 11, 2001, Dr. Lower observed that Lorum was ambulating "with a cane with a significant antalgic gait for the left lower extremity . . . ." TR. 491.  He treated Lorum with knee bracing, anti-inflammatory agents, and pain medication.

Treatment notes from the VA dated July 18, 2001, reflect that Lorum reported constant knee pain that worsened with weight bearing and climbing stairs.  TR. 352.  The attending physician noted that Lorum had mild crepitus with slight pain on ROM in his right knee and moderate to severe crepitus with pain on ROM in his left knee.  TR. 355.  She also noted that Lorum's pain was "not well controlled on his current regimen[,]" which included Codeine, Diclofenac, Gemfibrozil, Oxycodone, and Trazodone.  TR. 358.  Lorum was assessed with severe

---

[13] "An operation to restore as far as possible the integrity and functional power of a joint." STEDMAN'S at 150.

[14] "Elevated triglyceride concentration in the blood." STEDMAN'S at 832.

osteoarthritis of the left knee.  TR. 357.  The treatment records further reflect the Lorum requested

and was prescribed crutches to help with his knee pain.  TR. 359.

On August 14, 2001,  Lorum reported significant instability and "feeling of giving way" in

his left knee even while wearing a knee brace.  TR. 341.  He was assessed with traumatic left knee

arthritis and treated with a synvisc[15] injection.  *Id*. Thereafter, he was discharged in a wheelchair

with restrictions of no heavy lifting, pushing, or pulling for forty-eight hours.  TR. 340.

On September 2, 2001, Lorum presented to Memorial Hospital with complaints of chest

and jaw pain.  TR. 281-96.  The impression of the attending physician was angina.[16]  TR. 281.

On October 1, 2001, Lorum presented to Dr. Lower with increased complaints of neck

pain.  Dr. Lower observed that Lorum had restricted spinal mobility with rotation and cervical

paraspinal muscle spasms.  Spurling's sign[17] was negative.  Dr. Lower's impression was

osteoarthritis of the left knee and cervical degenerative disc disease.  TR. 488.

On November 9, 2001, Lorum reported increased pain in his knee.  His morphine

prescription was changed to methadone.  TR. 325.  Treatment notes from the VA indicate that

---

[15] "A type of medication given as a series of 3 to 5 weekly injections that can relieve pain in some people with osteoarthritis."  *See* THE CLEVELAND CLINIC HEALTH INFORMATION CENTER, http://www.clevelandclinic.org/health/health-info/docs/3100/3134.asp?index=10941 (last visited March 28, 2006).

[16] In this instance, "severe constricting pain in the chest, often radiating from the precordium to a shoulder (usually left) and down the arm, due to ischemia of the heart muscle usually caused by coronary disease." STEDMAN'S at 83.

[17] "Spurling's sign refers to the reproduction or exacerbation of pain upon pushing down on the head and bending it toward the involved side."  UCLA, *Spinal Diseases & Disorders, Cervical Disc Disease*, http://neurosurgery.ucla.edu/Diagnoses/Spinal/SpinalDis_1.html (last visited March 28, 2006).

-14-

Lorum had several outpatient pain/massage therapy appointments cancelled in November and December 2001.  TR. 440.  It is unclear who cancelled the appointments.  The treatment notes further reflect that as of December 2001, Lorum was taking the following medications: (1) Gemfibrozil; (2) Propoxyphene; (3) Diclofenac; (4) Methadone; and (5) Oxycodone.[18]  TR. 431.

On February 13, 2002, Lorum presented to the VA with complaints of knee, neck, and back pain.  TR. 314-15.  Lorum reported that his current pain medications were ineffective.  TR. 314.  His methadone prescription was increased.  TR. 315.  The treatment notes reflect that Lorum recently missed an acupuncture appointment.  TR. 314.

On February 28, 2002, Lorum presented to the VA with complaints of left hip, knee, and ankle pain.  He described the pain as aching, throbbing, sharp, tender, burning, tiring, miserable, unbearable, radiating, and "pressure."  TR. 306.  Lorum reported that the pain interfered with his general activity, mood, walking ability, normal work, relations with other people, sleep, and enjoyment of life.  *Id*.

In March 2002, Lorum presented to the VA following an injury to two of the toes in his left foot.  TR. 561.  Lorum reported that he drooped a twenty pound weight on his toes while "putting away weights with his son."  TR. 562.  The impression of the attending physician was "nondisplaced fracture through the base of the proximal phalanx of the second toe."  TR. 561.

---

[18] Propoxyphene, Diclofenac, Methadone, and Oxycodone are all pain medications.  *See* MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginformation.html (last visited March 28, 2006).

On March 12, 2002, a pharmacy note in the VA records indicates that Lorum called and complained because the pharmacy voided pain medication prescriptions issued by Dr. Lower when it learned that Lorum had already filled the prescriptions elsewhere. R. 563. It appears that Lorum was subsequently able to receive his pain medication. *Id.*

On April 29, 2002, Dr. Lower opined that Lorum had "a significant orthopedic disability that would prevent him from standing for protracted periods of time, walking long distances, or repetitive bending, stooping, or lifting." TR. 484. He classified Lorum as "a limited community ambulator with the aid of an orthopedic device with chronic pain syndrome." *Id*.

On June 20, 2002, Dr. Lower opined that Lorum was "a candidate for a left total knee arthroplasty." TR. 482. Dr. Lower noted that Lorum had restricted spinal mobility with rotation with associated cervical paraspinal muscle spasms and dysmetria.[19] Spurling's sign was positive. Dr. Lower's impression was cervical degenerative disc disease with right upper extremity radiculopathy and moderate osteoarthritis of the left knee. *Id*.

On August 14, 2002, Lorum presented to Dr. Lower with continued complaints of pain. TR. 480. Dr. Lower treated Lorum with anti-inflammatory agents and pain medication. Dr. Lower's impression was cervical degenerative disc disease and moderate osteoarthritis of the knees. *Id*.

On November 11, 2002, Lorum presented to Dr. Lower with increased complaints of right knee pain. Dr. Lower noted that x-rays of Lorum's right knee revealed tricompartmental

---

[19] "An aspect of ataxia, in which the ability to control the distance, power, and speed of an act is impaired." STEDMAN'S at 533.

osteoarthritis.  Dr. Lower's impression was bilateral severe osteoarthritis of the knees.  TR. 477.

He prescribed Arthrotec, Robaxin, and Percocet.  TR. 478.

Dr. Lower continued to treat Lorum with bracing, anti-inflammatory agents, and pain

medication.  TR. 513-21.  Dr. Lower consistently diagnosed Lorum with bilateral osteoarthritis of

the knees and severe osteoarthritis of the right knee.  *Id*.  In April 2003, Dr. Lower noted that

Lorum reported increased pain, swelling, and loss of ROM in his right knee.  TR. 516.  Dr. Lower

also noted that Lorum was being considered for arthroplasty of the knees.  TR. 513-15.  Dr. Lower

opined that Lorum was "in need of a right knee arthroplasty."  TR. 516.

C.      *Reviewing Professionals*.

On April 29, 1998, Eric Puestow, M.D., reviewed Lorum's records and prepared a physical

RFC assessment at the request of the SSA.  TR. 207-14.  Dr. Puestow opined that Lorum could

frequently lift ten pounds and occasionally lift twenty pounds.  He could stand or walk (with

normal breaks) two hours in an eight-hour workday.  He could sit for about six hours in an eight-

hour workday.  His ability to push and/or pull was limited in his left lower extremity.  TR. 208.

Although Dr. Puestow's notes are not altogether clear, it appears that he was of the opinion that

Lorum could balance, stoop, kneel, or crouch occasionally, never crawl and that he could climb

some things occasionally but never other things.  TR. 209.[20]

On March 12, 1999, D. Morford, M.D., reviewed Lorum's records and prepared a physical

RFC assessment at the request of the SSA.  TR. 230-37.  Dr. Morford opined that Lorum could

---

[20] The form asked about the ability to climb ramps/stairs and ladders/ropes/scaffolds.  Dr. Puestow checked the box for "occasionally" and for "never."  TR. 209.

frequently lift ten pounds and occasionally lift twenty pounds.  He could stand or walk (with normal breaks) four hours in an eight-hour workday.  He could sit for about six hours in an eight-hour workday.  His ability to push and/or pull was limited in his left lower extremity.  TR. 231.  Dr. Morford opined that Lorum could only climb, balance, stoop, kneel on the right, crouch, or crawl occasionally. He could never kneel on the left.  TR. 232.  Lorum was to avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, and hazards, such as machinery and heights.  TR. 234.

        On August 3, 1999, Nicholas H. Bancks, M.D., reviewed Lorum's records and prepared a physical RFC assessment at the request of the SSA.  TR. 256-63.  Dr. Bancks opined that Lorum could frequently lift ten pounds and occasionally lift twenty pounds.  He could stand or walk (with normal breaks) four hours in an eight-hour workday.  He could sit for about six hours in an eight-hour workday.  His ability to push and/or pull was limited in his left lower extremity.  TR. 257.  Dr. Bancks opined that Lorum could only climb, balance, stoop, kneel, crouch, or crawl occasionally, except that he could never climb ladders/ropes/scaffolds.  TR. 258.  Lorum was to avoid concentrated exposure to vibration, fumes, odors dusts, gases, poor ventilation, and hazards, such as machinery and heights.  TR. 260.  On December 26, 2001, Dr. Bancks, reviewed Lorum's records and prepared another physical RFC assessment at the request of the SSA.  TR. 297-304.  His assessment of Lorum's condition was unchanged, except that he opined that Lorum could now stoop frequently, and that he no longer needed to avoid concentrated exposure to vibration, fumes, odors dusts, gases, and poor ventilation.  TR. 299, 301.

Thereafter, in 2002, Thomas S. Edwards, M.D., reviewed Lorum's records and prepared physical RFC assessment at the request of the SSA.  TR. 469-76.  Dr. Edwards opined that Lorum could frequently lift less than ten pounds and occasionally lift ten pounds.  He could stand or walk (with normal breaks) less than two hours in an eight-hour workday with a medically required hand-held assistive device necessary for ambulation.  He could sit for less than six hours in an eight-hour workday.  His ability to push and/or pull was limited in his lower extremities.   TR. 470.  Dr. Edwards opined that Lorum could only climb ramps/stairs, balance, kneel, stoop, crouch, or crawl occasionally, and that he could never climb ladders, ropes, or scaffolds.  TR. 471.  Lorum was to avoid concentrated exposure to extreme heat and cold, wetness, humidity, and hazards, such as machinery and heights.  TR. 473.

   D.  *VA Determinations*.

On August 12, 1998, the VA issued a "Rating Decision," in which it determined that Lorum's left knee injury, with osteoarthritis, resulted in a 10% disability rating.  The VA further determined that Lorum had tendinitis in his left ankle, which also resulted in a 10% disability rating, effective March 25, 1997.  TR. 215.

On July 25, 2001, the VA issued another "Rating Decision" concerning Lorum's disabilities.  TR. 278-80.  In sum, the VA increased Lorum's disability rating for his left knee to 30% effective March 25, 1997, and it determined that instability in his right knee resulted in a 20% disability rating effective March 31, 1999.  TR. 278.

Thereafter, in August 2001, the VA notified Lorum that he had been assigned a combined disability rating of 70% effective March 31, 1999.  TR. 273.  The VA awarded Lorum disability

payments at a rate of 100% based on a finding that he was unable to secure employment as a result of his service-connected disability.  TR. 273.

## IV.     STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards.  *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1986).  While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision.  *Id*. at 1000.  Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence.  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The Court may not reweigh the evidence or substitute its own judgment for that of the SSA.  *Id*.  When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  A "physical or mental

impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). The Act provides further that a claimant is not disabled if he is capable of performing his previous work or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits. In sum, when evaluating a claim for benefits under OASDI an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment or combination of impairments severe?

(3) Does the claimant's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?[21]

20 C.F.R. § 404.1520(a)(4).

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel*, 800 F.2d at 1030.

---

[21] In an OASDI case, a claimant must also establish that he was disabled during the time that he was insured under the act. *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

**V.       ANALYSIS.**

Lorum raises four issues on appeal.  Three of the issues arise from the contention that the ALJ did not properly assess the functional limitations arising from the pain Lorum experienced. Lorum also asserts that the ALJ failed to assign the appropriate weight to the VA's disability determination. These are the only issues I will address.

*A.       Functional Limitations Arising From Pain.*

Lorum contends the ALJ did not properly assess the functional limitations arising from his pain, and improperly found his testimony regarding those limitations not entirely credible.  He further asserts that he had nonexertional limitations arising from pain that precluded use of the grids at step five of the sequential evaluation process.  The SSA defines nonexertional limitations as any limitations on the ability to work other than the seven exertional (strength) demands, specifically standing, walking, sitting, lifting, carrying, pushing, and pulling.  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *5-6 (July 2, 1996).

In this circuit, "'[t]he pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)). If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  *Foote*, 67 F.3d at 1562.  If the

-22-

Commissioner discredits the claimant's subjective testimony, "[s]he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62.

In this case, the ALJ found that Lorum had osteoarthritis, which is an underlying medical condition that could reasonably be expected to give rise to the alleged pain in his lower extremities.  The ALJ also recognized the Lorum's obesity exacerbated the pain arising from this impairment.  Objective medical evidence provided ample findings to support Lorum's complaints of pain.  X-rays showed severe osteoarthritis and degenerative joint disease in his knees and moderate osteoarthritis in his left hip.  Examinations revealed pain on palpation and crepitus, and physicians observed that Lorum walked with an antalgic gait.

Dr. Lower and all of the reviewing physicians opined that Lorum's pain would result in functional limitations in his ability to perform certain postural activities.  The ALJ acknowledged the restrictions set forth in Dr. Lower's records, which concerned Lorum's ability to perform repetitive bending, stooping, and repetitive squatting.  TR. 17.  He purported to give great weight to the 2002 RFC assessment made by Dr. Edwards, TR. 20 (Exhibit 19F), but he did not acknowledge that this assessment also included limitations on postural activities.  He also did not acknowledge Dr. Edwards's opinion that Lorum would have a limitation in the exertional demand of pushing and pulling with his lower extremities, would need to use a hand-held assistive device to ambulate, and would have environmental restrictions on the places in which he could work. Finally, the ALJ's opinion makes no mention of the other RFC assessments made by reviewing physicians during the alleged period of disability.  Drs. Puestow, Morford and Bancks all opined that Lorum would, during that period, have postural limitations.

-23-

While the ALJ made many findings about the credibility of Lorum's testimony, he did not explain why he rejected the opinion of Dr. Lower and every reviewing physician regarding Lorum's nonexertional limitations.  The law is clear that an ALJ may not act as both judge and physician, and his RFC findings must be consistent with the objective medical evidence in the record–they may not be the product of the ALJ's own medical conclusions.  *See Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992).  Furthermore, the SSA recognizes that the assessment of nonexertional impairments is extremely important because " if an individual is limited in balancing even when standing or walking on level terrain, there may be a significant erosion of the unskilled sedentary occupation base."  SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).  Moreover, " [a]n ability to stoop occasionally … is required in most unskilled sedentary occupations." *Id*. at 8.   If the ALJ had concluded that Lorum had nonexertional limitations, he should have called upon a vocational expert to determine whether there was work Lorum could perform, rather than relying on the grids at step five of the sequential evaluation process.  *See Marbury*, 957 F.2d at 839.

Accordingly, remand is required to permit the Commissioner to reassess the functional limitations arising from Lorum's pain and to determine whether, based on those limitations, there was any work available that he could have performed.

B.       *Weight Given to VA Disability Rating.*

While a "VA rating is certainly not binding on the [Commissioner], . . . it is evidence that should be considered and is entitled to great weight." *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981); *see also Hogard v. Sullivan*, 733 F. Supp. 1465, 1468 (M.D. Fla. 1990).  Lorum was insured through December 31, 2000.  As previously discussed, in August 2001, the VA assigned Lorum a combined disability rating of 70% effective March 31, 1999.  TR. 273.  This rating was based in part on the VA's determination that instability in Lorum's right knee had resulted in a 20% disability rating effective March 31, 1999.  TR. 278.

The ALJ declined to afford significant weight to the VA's rating, concluding that it was based on an evaluation performed by Dr. Lower that took place on May 1, 2001, after Lorum's date last insured.  TR. 19, 269-71. The ALJ further noted that Lorum had never complained of difficulty with his right knee prior to this evaluation.   TR. 19.

The ALJ's stated reasons for disregarding the VA's rating decision are not supported by substantial evidence.  First and foremost, the VA's rating decision was not based solely on Dr. Lower's May 1, 2001, evaluation.  Rather, the VA's rating decision was based on treatment notes dating back at least to February 25, 1999.  TR. 278.  In addition, although Dr. Lower's May 2001, evaluation is the only medical evidence cited in support of the VA's determination that instability in Lorum's right knee resulted in a 20% disability rating, treatment notes from the VA indicate that Lorum began complaining of problems with his right knee as early as June 2000, which was before his last date insured.  TR. 499, *see also* 371.

The Court may not affirm a decision simply because some basis might have supported it, if the stated reasons are insufficient to sustain the Commissioner's decision.  *See Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984).  Accordingly, on remand, the Commissioner must also reassess the weight to be afforded to the VA's disability determination.

**VI.     CONCLUSION.**

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings consistent with the foregoing analysis.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 29th day of March, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties